IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER ANTHONY TORRES,<br><br>Defendant. | No. CR14-0126<br><br>REPORT AND<br>RECOMMENDATION |

On the 15th day of December 2014, this matter came on for hearing on the Motion to Suppress Evidence (docket number 8) filed by the Defendant on December 2, 2014. The Government was represented by Assistant United States Attorney Timothy L. Vavricek. Defendant Christopher Anthony Torres appeared in person and was represented by his attorney, Alfred E. Willett.

## I. PROCEDURAL HISTORY

On November 4, 2014, Defendant Christopher Anthony Torres was charged by Indictment with possession of a firearm and ammunition by an unlawful user of marijuana (Count 1) and unlawful possession of a National Firearms Act firearm (Count 2). Defendant appeared on November 6 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on January 5, 2015. However, Defendant appeared on December 17 and entered a conditional plea of guilty to Count 2.

On December 2, 2014, Defendant timely filed the instant motion to suppress. The Government filed its resistance on December 11.

## II. RELEVANT FACTS

During the early morning hours of July 25, 2014, Officer Nathan Baughan of the Cedar Rapids Police Department was on routine patrol. At approximately 4:00 a.m., Baughan received a call from dispatch regarding "shots fired" at 1135 15th Street. Baughan was nearby and arrived at the scene approximately one minute later. The events which followed, including radio traffic between Baughan, dispatch, and other officers, were captured on a video and audio recording made from Baughan's patrol car.[1]

Officer Baughan was the first officer to arrive on the scene, with a sergeant arriving a short time later. Baughan parked about a block away, got out of his patrol car, and proceeded to an alley where he could observe the area. Baughan reported to dispatch, however, that "1135" 15th Street SE was an empty lot. There was a residence at 1129 and one at 1137. Both of the houses were "dark and quiet," with no sign of movement inside.

While Officer Baughan and the sergeant were looking for the shooter, a second call came in suggesting there was some confusion regarding where the shooting occurred. The dispatcher reported that she went back and listened to the tape and the first caller identified 1135 15th Street SE. Other callers, however, reported shots fired at 1435 5th Avenue SE. Officer Baughan testified that the second location is approximately one-half mile due north of the first location. Officers dispatched to the second location reported persons at the corner of 5th Avenue and 15th Street yelling for someone to "get the cops." Radio traffic indicated there was evidence of gunshot damage to the house at that location.

Officer Baughan's supervisor speculated there may have been some confusion about the address and suggested the area near 1135 15th Street may be "a wild goose chase." Baughan was instructed, however, to remain at the first location and monitor the residence at 1137 15th Street. Approximately eight minutes after first arriving at the scene, the video recording shows the second patrol car leaving and Baughan driving around the block

---

[1] A DVD of the recording was introduced as Government's Exhibit 1.

to reposition his vehicle. Baughan testified he believed that pulling his vehicle into the alley would give him a better vantage point to watch the subject house.

Officer Baughan testified that as he approached the alley, and before turning left into the alley, he observed two persons emerge from a bush. Because the patrol car was not yet heading down the alley, however, Baughan's initial observations cannot be seen on the video recording. Baughan noticed the male was wearing black pants, which was consistent with information he had received from dispatch regarding the alleged shooter. Baughan testified he had no further information regarding the shooter's appearance.

As Officer Baughan entered the alley, the persons were walking away. As Baughan approached the individuals, they stopped by the side of the alley, near a bush, apparently intending to let Baughan drive by. When Baughan stopped his vehicle, however, the female immediately started walking toward the driver's side of the patrol car. The male (later identified as Defendant Christopher Anthony Torres) took two steps in the direction he was initially headed, but then turned and followed the female. The video recording clearly shows Defendant walking with an awkward gait, as if something were hidden in his pants. Baughan testified at the hearing that as Defendant walked toward him, his shoulder was "dropped," he was walking with a pronounced "limp," and Baughan could see a very large bulge in Defendant's pants off his right hip. Defendant also "bladed" his right side in an attempt to keep it away from Baughan. According to Baughan, these are all signs that Defendant was carrying a weapon.

Officer Baughan got out of his vehicle and asked "who are you guys?" The subjects identified themselves and Baughan asked where they lived. Baughan then advised Defendant that he was "going to pat you down for weapons" because there had been a shooting. Defendant immediately responded that "by law, you can't search me," and added "I'm not giving you consent to search." Officer Baughan told Defendant that he was "not searching you, I'm patting you down for weapons" and instructed Defendant to

put his hands on the car. Defendant complied, but again told Baughan that "I don't give you consent to search."

Officer Baughan immediately patted the outside of Defendant's right hip, and then lifted his sweatshirt and removed a short-barrel AK-47 which had been modified to operate as a .22 caliber. The barrel length was 9 inches, with an overall length of 18 inches.[2] After the pat-down was completed, Defendant was placed in handcuffs and additional officers arrived. Defendant was then placed in the back of Baughan's squad car.

## III. DISCUSSION

The Fourth Amendment protects persons against unreasonable searches and seizures. Searches conducted without a warrant are per se unreasonable, "subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993). One such exception was recognized in *Terry v. Ohio*, 392 U.S. 1 (1968). *Id.* at 372-73.

In the landmark *Terry* case, the Court held that where a police officer observes unusual conduct which leads him reasonably to conclude that criminal activity may be afoot, the officer may briefly stop the suspicious person and make "reasonable inquiries" regarding his suspicions. 392 U.S. at 30. Furthermore, the officer may conduct a pat-down to search for weapons where he has "reason to believe that he is dealing with an armed and dangerous individual." *Id.* at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Courts apply an objective test to resolve the question of whether a reasonable, articulable suspicion justified a protective search. *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002).

---

[2] A photograph of the weapon was introduced as Exhibit 2.

4

Here, Officer Baughan was called to the scene of a suspected shooting. Baughan testified that this was an "extremely high crime area." According to Baughan, during the last two years there have been over 100 shootings in this area each year. Baughan has personally removed handguns from three persons in this area during the last year alone. At the nearby corner of 15th Street and Mount Vernon Avenue, there have been two armed robberies, multiple thefts, and shootings. Just one and a half months earlier, there was a shooting and a stolen 9mm handgun was taken from a juvenile. Baughan testified he had personally worked multiple shootings along the 15th Street corridor.

Shortly after arriving at the scene of a reported shooting, Officer Baughan observed two persons emerge from a bush in a nearby alley. When Baughan approached the individuals, he observed Defendant walking with a pronounced "limp," and could see a very large bulge in Defendant's pants off his right hip. Defendant's shoulder was also "dropped," and he "bladed" his right side in an attempt to keep it away from Baughan. The pants being worn by Defendant also matched those of the reported shooter. Based on the nature of the call, the time of night, Defendant's suspicious activities, and the observations suggesting Defendant was carrying a weapon, an objective person would clearly have "reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27. Furthermore, "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

I believe this is a classic *Terry* stop, followed by a permissible pat-down for weapons. Officer Baughan was not acting on a hunch or mere suspicion in stopping Defendant. Rather, he responded to a reported shooting and observed Defendant emerge from a bush with obvious signs indicating that he was hiding something in his pants. It was not necessary that Baughan be "absolutely certain that the individual was armed." *Id.* Baughan's pat-down of Defendant immediately revealed the sawed-off rifle. Indeed, Defendant does not argue that the protective search went beyond what was necessary to

determine if the suspect was armed. *Id.* at 26 (a protective search must be strictly limited "to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby").

In his brief, Defendant relies primarily on *United States v. Jones*, 606 F.3d 964 (8th Cir. 2010). There, an officer decided to "stop and frisk" a person who was walking on a mild September afternoon "wearing a long-sleeved hooded sweatshirt and 'clutching the front area of his hoodie pocket with his right hand.'" *Id.* at 965. The government argued that the officer had reasonable suspicion to believe that Jones was holding a firearm against his body. Clutching the outside of a hoodie pocket is one of the firearm-carrying clues the officer had been trained to observe. *Id.* However, the suspect did not exhibit any of the other clues which the officer had been trained to look for "such as walking with an unusual gait, turning that part of his body away from the officers' view, adjusting his grip or the location of the item in his pocket, or running away." *Id.* at 967. Under the totality of the circumstances, the Court found that the officer violated the suspect's Fourth Amendment rights.

Defendant asserts that "[t]he facts of the present case are comparable to the facts in *United States v. Jones*."[3] I believe the facts in the instant action are easily distinguishable from those in *Jones*. Defendant was not simply walking down the street on a mild September afternoon. Instead, he was observed at 4:15 a.m., emerging from bushes on an alley near where a shooting had been reported only 10 minutes earlier. Defendant was not simply clutching the front of his sweatshirt pocket. Instead, he matched the description (albeit limited) of the reported shooter, was walking with an awkward gait, had a very large bulge on his right hip, his right shoulder was dropped, and he bladed his right side in an attempt to keep it away from the officer. Officer Baughan did not simply make a random decision to stop someone walking down the street, but rather was

---

[3] Defendant's Memorandum (docket number 8-1) at 5.

6

investigating an alleged shooting which occurred only minutes earlier. I believe Defendant's reliance on the holding in *Jones* is unfounded.

I believe the facts in this case are more akin to those found in *United States v. Roggeman*, 279 F.3d 573 (8th Cir. 2002). There, a pat-down search of a bulge in the defendant's right-front pants pocket during a routine traffic stop led to the seizure of marijuana. In reversing the district court, the Eighth Circuit Court of Appeals concluded there was no Fourth Amendment violation. The Court wrote that "[r]easonable suspicion is not a 'finely-tuned' or bright-line standard; each case involving a determination of reasonable suspicion must be decided on its own facts." *Id.* at 578. The Court noted that the officer was alone, he stopped the defendant late at night, and the scene of the stop was poorly lit. Similarly, Officer Baughan was alone, it was late at night, the encounter was in an isolated area, it was near the scene of a recent reported shooting, and in a high crime area. *United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) (Suspicious behavior in a high crime area may establish reasonable suspicion to conduct a *Terry* stop and pat-down.). Most significantly, Baughan observed Defendant walking with an awkward gait and an unusually large bulge on his right hip. "When determining whether the totality of the circumstances gave rise to reasonable suspicion justifying a protected *Terry* search, both this Court and our sister circuits consider a law-enforcement officer's observation of a bulge to be a substantial factor." *Roggeman*, 279 F.3d at 579.

In summary, both the stop and the protective search were authorized by *Terry*. Notwithstanding Defendant's protestations, his consent was not required. There was no Constitutional violation and Defendant's motion should be denied.

## IV. RECOMMENDATION

For the reasons set forth above, I respectfully **RECOMMEND** that Defendant's Motion to Suppress Evidence (docket number 8) be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with

a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on December 15, 2013.*

DATED this 23rd day of December, 2014.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA